**Exhibit C**

| | |
|---|---|
| REPUBLIC OF LIBERIA) <br> MONTSERRADO COUNTY | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, MONTSERRADO COUNTY, SITTING IN ITS DECEMBER TERM, A.D. 2024 |

BEFORE HIS HONOUR: J. KENNEDY PEABODY... RESIDENT CIRCUIT JUDGE

Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its Registered Agent, The LISCR Trust Company, 80 Broad Street, Monrovia, Liberia.................................. Movant

VERSUS

Pach Shemen, LLC by and thru its Manager, Mark Lichtenstein........................................................Respondent

VERSUS

Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its Registered Agent, The LISCR Trust Company, 80 Broad Street, Monrovia, Liberia............................... Respondent

) MOTION TO DISMISS

GROWING OUT OF THE CASE:

Pach Shemen, LLC by and thru its Manager, Mark Lichtenstein.............................................................Petitioner

VERSUS

Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its Registered Agent, The LISCR Trust Company, 80 Broad Street, Monrovia, Liberia............................... Respondent

) PETITION FOR THE
) ENFORCEMENT OF
) FOREIGN JUDGMENT

## MOVANT'S MOTION

AND NOW COMES MOVANT in the above entitled cause of action most respectfully praying Your Honour and this Honourable Court to grant Movant's Motion to dismiss for the following legal and factual reason.

1. Movant says that **Chapter 11, § 2(a) of Title 1, Civil Procedure Law of Liberia**, provides: "Time; grounds; At the time of service of his responsive pleadings, a party may move for judgment dismissing one or more claims for relief asserted against him in a complaint or counterclaim on any of the following grounds: That the court has not jurisdiction of the subject matter of the action." It is the contention of the Movant, that the Civil Law Court does not have subject matter Jurisdiction over matters of Bankruptcy and Insolvency in Liberia, hence, the Petition has been filed before the wrong court and should therefore be dismissed consistent with the above quoted citation of law.

2. Movant avers that although the Insolvency and Restructuring Act grants the Commercial Court exclusive jurisdiction over all insolvency cases, it also provides that the Act does not apply to Domestic Non-Resident Corporations. However, when a foreign judgment, such as one emanating from the United States Bankruptcy Court for the Southern District of New

York, is sought to be enforced in Liberia as in the instant case, the Liberian court with exclusive jurisdiction over the subject matter should preside over such proceedings.

3. That Section 8.6 of Insolvency and Restructuring Act of Liberia gives the Commercial Court **exclusive jurisdiction over all insolvency cases** under this Act, regardless of the amount involved and notwithstanding any monetary limits or thresholds, and all matters relating to the administration of a Debtor's Property and Estate or the disposition thereof.

4. That in the interest of Justice and fair play relative to these proceedings, Movant prays Your Honor and this Honorable Court to dismiss Petitioner Petition for enforcement of Foreign Judgment because this Court lack subject matter Jurisdiction.

WHEREFORE AND IN VIEW OF THE FOREGOING, Movant prays Your Honor and this Honorable Court to deny and dismiss, Petitioner's Petition in its entirety, and grant unto Movant any other relief as deemed just and proper in the premises.

Respectfully Submitted:
The above-named Movant,
Eletson Holdings Inc.
By and thru their Legal Counsels
Lex Group Liberia
Opposite Dominion Christian Fellowship Church
Congo Town, Monrovia, Liberia

_____
J. Daku Mulbah
Counsellor-At-Law

_____
Elizabeth Horace-Kwemi
Attorney-At-Law

Dated this _____ day December A. D., 2024

| | |
|---|---|
| REPUBLIC OF LIBERIA ) | IN THE OFFICES OF THE JUSTICE OF THE |
| MONTSERRADO COUNTY) | PEACE FOR MONTSERRADO, CITY OF MONROVIA, LIBERIA |

| | |
|---|---|
| Eletson Holdings Inc., a nonresident ) | |
| Liberian Corporation, c/o its Registered ) | |
| Agent, the LISCR Trust Company, 80 Broad ) | |
| Street, Monrovia, Liberia….....…..Movant ) | |
| ) | |
| Versus ) | MOTION TO DISMISS |
| ) | |
| Pach Shemen LLC by and thru its ) | |
| Manager, Mark Lichtenstein….. Respondent) | |
| ) | |
| GROWING OUT OF THE CASE: ) | |
| ) | |
| Pach Shemen LLC by and thru its ) | |
| Manager, Mark Lichtenstein……. Petitioner ) | |
| ) | |
| Versus ) | PETITION FOR THE |
| ) | ENFORCEMENT OF |
| Eletson Holdings Inc., a nonresident ) | FOREIGN JUDGMENT |
| Liberian Corporation, c/o its Registered ) | |
| Agent, the LISCR Trust Company, 80 Broad) | |
| Street, Monrovia, Liberia…....… Respondent) | |

## AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified and commissioned Justice of the Peace for Montserrado County, at my office in the City of Monrovia, the Movant by and thru one of its legal counsel, Counsellor J. Daku Mulbah, and made oath in keeping with law that all and singular the averments as are set forth and contained in the attached Movant's Motion to Dismiss are true and correct to the best of his knowledge and belief.

Sworn and subscribed to this 16th day of December A.D. 2024.

_____
JUSTICE OF THE PEACE
Montserrado County, R.L.

_____
J. Daku Mulbah
Counsellor-At-Law/Affiant

$3.00 Revenue Stamp affixed to the Original.

| | |
|---|---|
| REPUBLIC OF LIBERIA ) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL |
| MONTSERADDO COUNTY) | CIRCUIT, MONTSERADDO COUNTY, SITTING |
| | IN ITS DECEMBER TERM, A.D. 2014 |

### BEFORE HIS HONOUR: J. KENNEDY PEABODY……. RESIDENT CIRCUIT JUDGE

| | |
|---|---|
| Pach Shemen LLC by and thru its ) | |
| Manager, Mark Lichtenstein……. Petitioner ) | |
| ) | |
| Versus ) | PETITION FOR THE |
| ) | ENFORCEMENT OF |
| Eletson Holdings Inc., a nonresident ) | FOREIGN JUDGMENT |
| Liberian Corporation, c/o its Registered ) | |
| Agent, the LISCR Trust Company, 80 Broad) | |
| Street, Monrovia, Liberia…..…. Respondent) | |

### RESPONDENT'S RETURNS

Respondent in the above-entitled cause of action prays Your Honour and this Honourable Court to deny and dismiss Petitioner's Petition and for following legal and factual reasons.

### I. Legal Premise

1.1    That as to the entire Petition, Respondent says that it should be denied and dismissed because the judgment sought to be enforced is the subject of an appeal that has not been determined. Attached hereto and marked as Respondent's **Exhibit R/1** is the Notice of Appeal (docket 1233) and the Statement of Grounds of Appeal (docket 1264) both before the United States Bankruptcy Court for the Southern District of New York, evidencing the pendency of the appeal.

1.2.    That the Respondent's current Board of Directors have authorized Lex Group Liberia to file these returns challenging the enforcement of the judgment, because this court is at liberty to give or to refuse to give effect to the foreign judgment, which is sought to be enforced, if this court finds that to do so would be unjust and inequitable. The Supreme Court of Liberia in the case **Turner V. Burnette, 24 LLR 212 (1975),** held that "The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and <u>it is at liberty to give or refuse effect to it as may be found just and equitable</u>" [Emphasis supplied]. In the instant case, Respondent says that it would be unjust and inequitable to give effect to the foreign judgment sought to be enforced for the following factual and legal reasons.

1.3    That having made findings concerning the bad faith actions of Murchinson and its affiliates, the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this court is not so constrained and should refuse the enforcement of the bankruptcy judgment in Liberia, because it was obtained by the misuse of laws and with such bad faith on the part of the Petitioner. This court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was unjust and inequitable, and hence, a judgment obtained by such means should not be enforced in Liberia.

### II. Factual background

1

2.1 The Respondent is a corporation, which was incorporated on December 4, 1985, under Liberian law, with its headquarters and center of main interests located in Greece, where it maintains offices at 118 Kolokotroni Street, Piraeus. Holdings operates pursuant to Holdings' existing Articles of Incorporation, dated December 4, 1985, Restated Articles of Incorporation, dated June 29, 2007 (the "Restated AOI"), and Articles of Amendment, dated June 29, 2018, and as amended, modified, supplemented or restated from time to time, and filed and recognized in Liberia (the "Existing Articles of Incorporation"). **Article V, Section 5 of the Restated Articles of Incorporation,** provides that "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)

Attached hereto and marked as Respondent's **Exhibit R/ 2 in bulk** are copies of the Articles of Incorporation of the Respondent, Restated Articles of Incorporation of the Respondent, and Articles of Amendment of the Articles of Incorporation of the Respondent.

2.2 On October 22, 2013, the Respondent and Blackstone Tactical Opportunities ("**Blackstone**"), an alternative investments fund, founded a new company, Eletson Gas LLC ("**Eletson Gas**"), a limited liability company (LLC) established under the laws of the Marshall Islands. Pursuant to the Limited Liability Company Agreement signed Blackstone was the preferred shareholder of the Company, while the Respondent here held the common shares/units. The preferred shares granted Blackstone priority in dividend distributions and, under certain conditions, decisive control over the company. Eletson Gas owned, directly or indirectly, 14 liquefied petroleum gas carriers.

2.3 In November 2021, a hedge fund, Murchison Ltd ("**Murchison**"), purchased Blackstone's units in Eletson Gas (for a price later revealed to be just USD 3 million) and thus became the preferred unit holder in Eletson Gas, replacing Blackstone. The acquisition of Blackstone's preferred units was made through a company affiliated with Murchison, Levona Holdings Ltd ("**Levona**"), a special purpose vehicle (SPV) established under the laws of the British Virgin Islands (BVI).

2.4 On February 22, 2022 a Binding Offer Letter("the BOL") was agreed between, amongst others, the Respondent and Eletson Gas from the one part and Levona from the other part pursuant to which Eletson Gas would either pay Levona USD 23 million or transfer ownership of two vessels of equivalent value (specifically, the shares of the bareboat charterers of the vessels SYMI II ENE and TELENDOS II ENE) and in exchange, Levona would transfer its preferred membership units in Eletson Gas to Eletson Gas or entities nominated by the latter. Attached hereto and marked as Respondent's **Exhibit R/3** is a copy of the Binding Offer Letter.

2.5 Whilst Eletson Gas transferred on 11 March 2022 to Levona the shares it held in the ship-owning companies (bareboat chartering companies) of MT SYMI and MT TELENDOS, valued at USD 23,000,000 and nominated the three Cypriot shipping companies Fentalon Limited, Apargo Limited, and Desimusco Trading Limited as its new preferred shareholders. Sometime later, Levona suddenly began to claim, around mid-July 2022, that it had not transferred its preferred shares in Eletson Gas. According to Levona, this was because, under the terms of the BOL, Eletson Gas was supposed to have followed certain formal procedures to exercise an option to acquire the preferred shares, which, according to Levona's claims, had not taken place. "Consequently, Levona began to assert that although both the two vessels (and more specifically the shares of the bareboat chartering companies of the vessels MT SYMI and MT TELENDOS) had been transferred to it, the preferred shares in Eletson Gas had not been properly transferred from Levona to Eletson Gas or its nominees. As a result, Levona asserted that it had both the two vessels and the preferred shares (units) in Eletson Gas and in mid-July 2022 it tried to sell the remaining twelve (12) vessels in Eletson Gas's fleet to Eletson Gas' main competitor, i.e. Unigas."

2.6 Specifically, on July 15, 2022, a Letter of Intent (LOI) was allegedly signed between Unigas and Eletson Gas, purportedly executed by a representative of Levona (who lacked the authority to sign on behalf of Eletson Gas). This LOI concerned the purported sale and transfer of the other twelve (12) vessels to Unigas, thus violating the terms of Limited Liability Company Agreement ("the LLCA"), as Levona was no longer a shareholder of Eletson Gas and had no right to negotiate or act on its behalf. Levona's actions caused damage not only to Eletson Gas but also to the New Preferred Shareholders, due to the conduct of Levona in bad faith, in breach of contractual terms, and contrary-to-good-faith and in breach of customary business practices. Attached hereto and marked as Respondent's **Exhibit R /4** is a copy of the Letter of Intent

.:

2.7     Following Levona's anti-contractual and bad-faith behavior, the Respondent and its subsidiary Eletson Corporation initiated arbitration in New York against Levona on July 29, 2022, based on the arbitration clause contained in Article 12.14(a) of the LLCA. The purpose of the arbitration was to resolve the dispute between the parties regarding whether Levona had transferred to Eletson Gas or to companies nominated by it the preferred shares (units), which (units) Levona held in Eletson Gas, as well as related corporate disputes arising from the LLCA. Attached hereto and marked as Respondent's **Exhibit R/5** is a copy of the claim/complaint filed before the Judicial Arbitration and Mediation Services Inc (JAMS) by the Respondent.

2.8     During the arbitration, serious illegalities and violations of good faith and fair dealing by Levona/Murchison were revealed, which occurred before it even acquired Blackstone's shares (units) in Eletson Gas, after the acquisition, and during the arbitration itself. These included, among others, that Levona/Murchison maliciously: (a) Bribed the Chief Financial Officer of Eletson Corporation to act against the interests of Eletson Holdings, (b) Violated the confidentiality obligations of the LLCA, (c) Interfered with Eletson Gas's relationships with its creditors, leading to the seizure of Eletson Gas's ships, (d) Falsified evidence by creating alleged minutes of a board meeting from March 10, 2022, after the arbitration had begun, (e) Conspired with certain of Eletson Gas's lawyers against the interests of Eletson Gas. Attached hereto and marked as Respondent's **Exhibit R/ 6** is the relevant excerpts from the Arbitrator's ruling confirming these facts.

2.9     On September 29, 2023, the Arbitrator ruled in favor of the claims of the Respondent and Eletson Corporation. Specifically, it recognized the bad faith, breach of contract, and actions contrary to good faith and fair dealing by Murchison/Levona, finding that the latter violated the LLCA in several ways. The Arbitrator also determined that Levona had indeed transferred its preferred shares in Eletson Gas to the Cypriot companies Fentalon, Apargo, and Desimusco Trading Limited that had been nominated by the Eleston Gas. Furthermore, the Arbitral Award awarded (a) USD 43,455,12.21 as compensatory damages, (b) USD 43.455.122,21 as punitive damages, and (c) attorneys' fees, costs, expenses and additional interest. This award was confirmed on February 9, 2024, by an order of the US District Court for the Southern District of New York, except from certain provisions which were vacated without, however, altering the amounts awarded or their designated beneficiaries. Attached hereto and marked as Respondent's **Exhibit R/7** in bulk are the arbitral award/ruling and the US District Court for the Southern District of New York February 9, 2024, confirmation order.

2.10    Meanwhile, even before the above arbitration award was issued the Petitioner, along with two other creditors of the Respondent, i.e. VR Global Partners L.P., and Alpine Partners L.P., initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Respondent and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. The alleged debtors at the time filed motion to dismiss the involuntary bankruptcy proceedings. However, following extensive litigation that lasted approximately 6 months, and given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Respondent here to retain control over its assets, at least until the anticipated arbitral award was issued, on September 7, 2023, Respondent agreed to a stipulation with the Petitioner to convert the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) to a voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code).

2.11    It should be stressed that the Petitioner (i.e. Pach Shemen LLC) was not an original creditor of the Respondent. In fact, it did not even exist before the arbitration had commenced. It was established by Levona in order to acquire at an extremely low-price old bonds issued by the Respondent and it used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the petition for bankruptcy was not made due to true and genuine insolvency of the Respondent and for its restructuring for the equal and fair satisfaction of the creditors, but it was made a shield of protection of its alter ego Levona in case the arbitration award was issued against it. More specifically, as the Judicial Arbitration and Mediation Services Inc (JAMS) arbitrator found (emphasis added):

*"On or about January 4, 2023, Pach Shemen purchased $183,851,546 in bonds of Holdings for $2 million. Additionally, Mr. Spears, on behalf of the Levona-related entities, offered additional consideration to the bondholders contingent on the outcome of this arbitration stating that it would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the company." The Holdings bonds were purchased by Pach Shemen from Nomis Bay and BPY via private trades and then transferred to Pach Shemen.*
*[...]*
*On January 11, 2023, Pach Shemen then instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on these bonds ("Bondholder Litigation"). Then on March 7, 2023, Pach Shemen and two other creditors of Holdings, <u>filed involuntary bankruptcy petitions</u> against Holdings in the Southern District of New York. The involuntary bankruptcy petition and some of the documents included in the filing were signed by Mr. Lichtenstein and Mr. Spears. (<u>The timing of this filing is notable—it was three days after I orally issued certain discovery rulings adverse to Levona, including that it had waived any claim of attorney-client privilege</u> . . . and ordering the production of Levona/Murchinson's communications with Kanelos.*
*[...]*
*As discussed, supra, Pach Shemen is the alter ego of Levona. The separateness is in name only. Its representatives, including Spears and Lichtenstein, were bound by the Status Quo Injunction. Despite this, Pach Shemen a/k/a Levona II, <u>entered into a trade to purchase the notes, offering as consideration value associated with the assets in dispute in this arbitration</u>.*
*[...]*
*In other words, the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration. They believed, at the time—although mistakenly—that if I ruled that Eletson had exercised the option and bought out Levona's interests, the preferred interests would pass to Holdings. Thus, by purchasing the bonds, it became a controlling creditor of Holdings with the ability to put Holdings into bankruptcy. In the first instance, the filing of the bankruptcy led to Levona's insistence that it could <u>not arbitrate these claims due to the automatic bankruptcy stay</u>. This was certainly not "maintain[ing] the status quo." In the event the stay was to be lifted, and Levona lost in this arbitration, the Levona-related entities were then positioned to argue that, as creditor to Holdings, the value of the preferred shares passed to them."*

2.12 Subsequently, following the bad faith tactics of Levona and its affiliated companies Murchinson/Pach Shemen, on October 25, 2024, the Bankruptcy Court of New York, presided over by Judge John P. MASTANDO, approved Petitioner's September 19, 2024 plan and on November 4, 2024, the court issued a confirmation order whose recognition is hereby sought, rejecting the objections of the Respondent and approving the reorganization plan proposed by the Creditors.

III. **Reasons why the petition for enforcement of the judgment should be denied and dismissed because it is inequitable and works grave injustice against the Respondent**

3.1 Respondent says that the petition for recognition of this judgment should be denied and dismissed for the following reasons:

3.2 The judgment sought to be recognized and enforced is the subject of an appeal that has not been determined. Whilst this appeal may not have automatically under US law the effect of stay of execution or enforceability, it is obvious that if the petition is upheld and the Petitioner is allowed to apply the judgment within Liberia and change the corporate structure and governess of the Respondent, then the above appeal will be in practice totally neutralized, it will have no realistic purpose to be judicially determined. The fact that a judgment in a case that is on appeal is enforceable by the US court does not mean that it is enforceable in Liberia. The Supreme Court of Liberia emphatically held in the case **Turner V. Burnette, 24 LLR 212 (1975)**, that "*in the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and <u>it is at liberty to give or refuse effect to it as may be found just and equitable</u>*". This court is at liberty to determine whether to give effect to the judgement or not, and the standard set by the Supreme Court in making the discretionary determination is premised on the theory of what is regarded as naturally

just and equitable. The decision of whether to enforce or not to enforce is not limited to a two-prong inquiry of (a) whether the foreign court had jurisdiction (b) whether the Respondent appeared in court. Instead by the standard set in **Turner V. Burnette**, the inquiry extends to whether to enforce or not to enforce the foreign judgment would be just and equitable. Under Liberian law, the right of appeal is one that the constitution of Liberia upholds as inviolable.

3.3   The bankruptcy proceedings were initiated in bad faith, which constitutes a violation of natural justice and equity As mentioned above and as determined by the Arbitrator Ariel E. Belen in his final arbitral award dated September 29, 2023, the conduct of Levona, as well as the affiliated companies Murchinson and the Petitioner which, according to the Arbitrator, are described as "each being the alter ego of the other" — towards the Respondent is entirely illegal, in breach of contract, unethical, and utterly in bad faith. The Petitioner used a legal procedure for totally other purposes. The Respondent was not truly facing insolvency problems, and the Petitioner did not truly aim at serving a genuine claim. It misused the bankruptcy procedure to protect itself against a possible unfavorable arbitration award. The fact that compensation and damages were awarded to affiliated companies of the Respondent and not to the Respondent itself does not change the reality that the bankruptcy procedure was misused to neutralize the arbitration proceedings.

3.4   Specifically, the bankruptcy petition in the US was not filed with the intent of financially restructuring the Respondent but was aimed at securing a strategic advantage in the arbitration already pending between the Respondent and Eletson Corporation against Levona (an alter-ego of Murchinson and Pach Shemen LLC, i.e. the Petitioner). The Petitioner, by offering financial incentives and providing legal and financial support to other participants in the bankruptcy proceedings, created a network of control and influence that allowed it to dictate the course of the process solely to serve its own interests (i.e., the interests of Murchinson / Pach Shemen LLC / Levona).

3.5   As noted above, the Petitioner herein was not an original creditor of the Respondent, but it acquired at an extremely low price the bonds and used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the Chapter 7 petition for bankruptcy was not initiated for the restructuring of the Respondent, nor was it done for the equal and fair satisfaction of the creditors, but it was initiated in order to avoid the debts of its alter ego Levona by obstructing justice, all of which are contrary to the public policy of any country. Thus, the acquisition of the Bonds by the Petitioner was never intended to achieve potential financial returns on the investment. Instead, the shared goal of Murchinson/Levona/the Petitioner was to orchestrate the bankruptcy process for their benefit in the arbitration and to gain control over the Respondent and, through it, Eletson Gas. Moreover, Murchinson/Lenova/Pach Shemen/Petitioner attempted to use information obtained during the bankruptcy process before the U.S. Bankruptcy Court to their advantage in the arbitration.

3.6   It should be noted that the misuse of the bankruptcy procedure by the Petitioner was also confirmed in the Confirmation Order dated October 25, 2024 of the U.S. Bankruptcy Court which states: :

> *While the Arbitration was pending, Murchinson and Levona sought an alternative means by which they could obtain control of the Gas assets should the Arbitration result in an adverse outcome. As part of these efforts, Murchinson and Levona negotiated with certain holders of the New Notes regarding the potential purchase of a majority of the then-outstanding New Notes. (DX-096 (the "Note Purchase Emails") (email chain discussing New Note purchase terms)). Murchinson's plan was to purchase a majority of the New Notes in order to embark on a potential "bankruptcy strategy" to exert control over the Debtors and prevail in the Arbitration. (DX-199 (the "Bankruptcy Strategy Emails") (discussing the need to move quickly because Murchinson already had "the lawyers in motion on the bankruptcy strategy")). Murchinson ultimately negotiated the purchase of a majority of the New Notes, totaling $183,851,546. (Final Award at 60). As consideration for its purchase of the New Notes, Murchinson agreed to pay to the selling noteholders: (i) $2,000,000 up front; (ii) an additional $500,000 if the Arbitration ended to Murchinson's satisfaction; (iii) 10% of the value received by Levona for its Gas Preferred Shares (excluding certain expenses), up to $1,000,000; (iv) one third of the first $3,000,000 profit realized by the entity holding the New Notes on Murchinson's behalf (excluding expenses); and (v) thereafter 25% of any profit realized by the entity holding the New Notes on*

*Murchinson's behalf after $3,000,000 of profit is earned under (iv). Murchinson formed Pach Shemen—another special purpose vehicle—on December 12, 2022, to hold the New Notes, which were officially acquired on January 4, 2023. (Final Award at 60).*

*The arbitrator assessed nearly $87 million in damages against Levona, Pach Shemen, and Murchinson, because the arbitrator found that, inter alia, Murchinson and its proxies: (i) bribed an officer (the former CFO) of Eletson Corporation and Gas to act against Gas' interests; (ii) breached an NDA by communicating directly with Gas financiers and lenders; (iii) intentionally violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the Arbitration; and (v) refused to produce relevant documents in the Arbitration.*

*. The U.S Bankruptcy Court further found that "[Mark] Lichtenstein and [Adam] Spears are each affiliated in various ways with Murchinson, Pach Shemen, and Levona"*

3.7   Having made these findings concerning the bad faith actions of Murchinson and its affiliates, the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan, and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this court is not so constrained and should not accept to recognize in Liberia a bankruptcy judgment that was obtained by the misuse of laws and with such bad faith of the Petitioner. The court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was therefore unjust and inequitable, and hence, a judgment obtained by that means should not be enforced in Liberia.

3.8   Because the U.S. Bankruptcy Court did not consider whether (or to what extent) the overall bad faith conduct of Murchison and Pach Shemen in planning and carrying out the scheme to seize control of the Respondent (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing as the sole shareholder of Respondent, that issue has been left for the Liberian court to determine. Moreover, the U.S. Bankruptcy Court was never even given the opportunity to determine whether Pach Shemen's last-minute tactic to modify its proposed plan to avoid the requirements of Liberian corporate law by purporting to act under the existing bylaws violated natural justice and fundamental due process. In connection with both, the plan that Pach Shemen now tries to enforce in Liberia violates Liberian law because it was made and exists in bad faith, and naturally and fundamentally unjust and inequitable.

3.9   Even whilst the appeal is pending before the United States Bankruptcy Court for the Southern District of New York, and the Petitioners have filed before this court a petition for the recognition and enforcement of the foreign judgment, the Petitioner have nevertheless embarked upon the process of taking control of the Respondent, purporting to be shareholders and officers of the Respondent, and writing letters to lawyers representing the Respondent to threaten that to represent the Respondent in these proceedings without the Petitioner's consent is unauthorized. In effect, the Petitioners are to decide who represents the Petitioners, and they are also the Respondent, and they get to decide who represents the Respondent in these proceedings. In other words, the Petitioners are to be regarded as the Petitioners and the Respondent in these proceedings. If the Petitioner have reason to believe that it is also the Respondent or controls what Respondent does in these proceeding before this Liberian court, and that they can lawfully be the Petitioner and the Respondent in the enforcement proceedings before the Liberian court, they are at liberty to challenge the Respondent's legal representation before the Liberian court, and this court will make the appropriate determination under Liberian law. But to elect to threaten and bully Liberian lawyers, in a bid to prevent the Respondent from selecting counsel of their choice to represent their interest in the proceeding for the enforcement of judgment before the Liberian court, is further proof of the depraved conduct of the Petitioner. The **Liberian Constitution, Article 21(i),** provides: "the right to counsel and the rights of counsel shall be

6

inviolable. There shall be no interference with the lawyer client relationship"....."There shall be absolute immunity from any government sanctions or interference in the performance of legal services as a counsellor or advocate; lawyers offices and homes shall not be searched or papers examined or taken save pursuant to a search warrant and court order; and no lawyer shall be prevented from or punished for providing legal services, regard less of the charges against or the guilt of his client."

3.10    Petitioner has further sought to extend its improper exercise of control to Respondent's subsidiaries and affiliates, representing to employees, customers, financial institutions, and even outside counsel of those subsidiaries and affiliates that — even as it purports to seek this Court's recognition of the bankruptcy court's order — it in fact already controls those subsidiaries and affiliates. Respondent has threatened and purported to give instructions to those employees, customers, financial institutions and outside counsel. Attached hereto and marked as Respondent's **Exhibit R/8** is a copy of an email written to Lex Group Liberia's Senior Consulting Counsel, Cllr. Betty Lamin-Blamo by a Mr. Adam Spears, who purports to be the CEO of the Respondent, along with a certificate of incumbency, and extract of minutes of meeting of the board of directors of Respondent where it is resolved that Lex Group Liberia represents the Respondent/Eletson Holdings Inc in these proceedings. Lex Group Liberia's business registration certificate is also attached.

3.11    The bankruptcy court's approved Petitioner's September 19, 2024 Plan on October 25, 2024, and confirmed same on November 4, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e-amendment of its Articles of Incorporation, etc.. For example, the Petitioner had proposed amendments to the Articles of Incorporation of the Respondent to remove certain restrictions on the transferability of shares as a part of their plan. When the Petitioner realized that in order to do this it would require tthat the amendment be filed by the Address of Record who was appointed by the Respondent, the Petitioner sought to amend the plan to provide that it would become effective prior to any of these procedures occurring — and therefore without needing to await a Liberian court recognition and enforcement of the judgment. On November 19, 2024, Petitioner filed a supplemental plan after the opinion and confirmation order of the court was issued on November 4, 2024. The supplemental plan excluded the proposed Amendment to the Article of Incorporation, and instead inserted the current Restated Articles of Incorporation which contains restrictions on the transferability of the Respondent shares. Petitioner intent is to evade and is in fact attempting to evade its prior commitment to the bankruptcy court that it would proceed in accordance with Liberian law. Although the supplemental plan of November 19, 2024, has not been confirmed by the Bankruptcy court, Petitioner is attempting to take control of the Respondent *before* obtaining a judgment from a competent Liberian court approving the enforcement of the New York bankruptcy court's confirmation order issued on November 4, 2024. The bankruptcy court was never asked by the Petitioner to approve its November 19, 2024, supplemental plan and strategy to transfer the shares of the Respondent in violation of Respondent's Articles of incorporation.

3.12    The Petitioning Creditors' Plan and Disclosure Statement "contemplate the submission of certain documents (or forms thereof) and schedules" to effectuate the Plan (noting the Plan Supplements are "integral to and considered part of the Amended Plan").    Accordingly, on August 2, 2024, September 19, 2024, and November 12, 2024, the Petitioning Creditors filed Plan Supplements, that included, among other things, a Form of Amended By-Laws, Form of Amended Certificate of Incorporation, and Form of Shareholders Agreement (the "Prior Plan Supplements"). By submitting an Amended Certificate of Incorporation in each of the Prior Plan Supplements, the Petitioning Creditors recognized that they would be required to file an Amended Certificate of Incorporation with the Liberia authorities in order to implement the Plan and to effectuate a change in management and control of the Respondent including the appointment of directors, officers, and legal representatives of the company.

3.13    Instead of complying with Liberian law and acting in accordance with their Plan, on November 19, 2024, the Petitioning Creditors filed a *Notice of (I) The Occurrence of the Effective Date and (II) Final Deadlines for Filing Certain Claims* (the "Effective Date Notice"), providing notice "that all conditions precedent to the Effective Date set forth in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.2 of the Plan" and notice of the occurrence of the Effective Date on November 19, 2024. On the same day, the Petitioning Creditors filed the *Notice of Filing of Third Amended Plan Supplement to the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its*

*Affiliated Debtors* (the "Plan Supplement"). In the Plan Supplement, the Petitioner for the first time and without any notice to or approval of the Bankruptcy Court, abandoned their previously-stated intention to submit their own Amended Certificate of Incorporation, Articles of Incorporation, and By-Laws and instead represented that "Eletson Holdings Inc. will continue under its existing Restated Articles of Incorporation of Eletson Holdings Inc., as filed on June 29, 2007 with the Republic of Liberia, as amended by the Articles of Amendment filed on June 29, 2018 (and as amended, modified, supplemented, or restated from time to time)." *Id.* at 3 (emphasis added). Attached hereto and marked as Respondent's **Exhibit R/9** is a copy of the petitioner's supplemental plan of November 19, 2024.

3.14  Under Respondent's existing *Restated Articles of Incorporation* (Article V, Section 5) it prohibits the authorized transfer of shares and it provides : "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)

3.15  The Respondent's current Board of Directors have authorized Lex Group Liberia to file these returns challenging the recognition and enforcement of the judgment, because this court is at liberty to give or to refuse to give effect to the foreign judgment, which is sought to be enforced, if this court finds that to do so would be unjust and inequitable. The Supreme Court of Liberia in the case **Turner V. Burnette,   24 LLR 212 (1975),** held that "*The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied]*.

3.16  That as to count one (1) of the petition, Respondent says that it presents no traversable issue.

3.17  That as to count two (2) of the petition, it presents no issue that needs to be traversed.

3.18.  That as to count three (3) of the petition, Respondent denies that the bankruptcy proceedings were initially commenced by the Respondent as a voluntary Chapter 11 bankruptcy proceedings. Instead, the proceedings were initially commenced by the Petitioner against the Respondent as a Chapter 7 involuntary bankruptcy proceeding. Respondent says that to provide full disclosure, is a core tenet of judicial fairness and integrity. Courts rely on comprehensive and accurate information to deliver just and equitable decisions. The Petition's omissions undermine the Court's ability to consider the matter fully and fairly. The Petitioner failed to disclose to the Court that the bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York were not commenced as voluntary Chapter 11 bankruptcy proceedings, but as involuntary Chapter 7 bankruptcy proceedings. As mentioned above in paragraph  2.7 while the Respondent and Eletson Corporation had already initiated arbitration proceedings against Levona on July 29, 2022, on March 7, 2023, the Petitioner, along with two other creditors of the Respondent, initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Respondent and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. Given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Respondent to retain control over its assets, at least until the anticipated arbitral award was issued, on September 6, 2023, the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) were converted into voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code). The fact that the bankruptcy proceedings were initiated as involuntary Chapter 7 bankruptcy proceedings, and they were then converted into voluntary Chapter 11 bankruptcy proceedings is very important in this case and is not explicitly written in the Petition. This fact shows that the bankruptcy proceedings were not initiated voluntarily by the Respondent and that the Respondent was actually forced into bankruptcy by the filing of a bad-faith involuntary petition by the Petitioners.

3.19  That as to count four (4) of the Petition, Respondent says that it did  file a bankruptcy plan as a result of the proceedings that were initially commenced by the Petitioner against the Respondent as a Chapter 7 involuntary bankruptcy proceeding which later forced Respondent

because of the circumstances at the time, to stipulate with the Petitioner to convert the the Chapre 7 to a Chapter 11 proceedings.

3.20    That as to count five (5) and six(6) of the Petition, Respondent says that although the court did review the plans of the parties, the court did not consider whether (or to what extent) the overall bad faith conduct of Murchison/ Pach Shemen in planning and carrying out the scheme to seize control of the Respondent (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing and the Plan submitted by it. On October 25, 2025, the court approved the Petitioner's plan submitted on September 19, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e.-amendment of its Articles of Incorporation, etc. The court did not approve any supplemental plan thereafter.

3.21    That as to count seven (7) of the petition, Respondent says that it is a non-resident Liberian domestic corporation. However, it refutes that amendments to the Respondent's Articles of Incorporation must be filed and registered with the Liberian International Ship & Corporate Registry (LISCR). LISCR is the statutory registered agent for Liberian non-resident domestic corporations and Foreign Maritime Entities only. LISCR is responsible for receipt and service of process, and to ensure the keeping of the required information of directors, management, and ownership to enable accessibility and availability of that information to the relevant competent authorities. The Registrar - the Minister of Foreign Affairs-the US equivalent of Secretary of State or the Deputy Registrar, or an official of the Liberian Government designated by the Registrar are authorized under the Business Corporation Act to file and effect amendments to the Articles of Incorporation of Liberian corporations.

3.22    That as to count eight (8) of the petition, Respondent confirms and affirms count 3.21 above and says further that LISCR as the statutory registered agent of non-resident domestic corporation, it is authorized to adopt procedures and other mechanisms for the smooth operation of the Registry. Filings and submission of information relating to directors, management, and ownership of non-resident corporations (incumbency) can be made and accepted only from a pre-designated authorized representative of the non-resident domestic corporation and Foreign Maritime Entities known and referred to as the Address of Record ("AOR") as per the procedure established by LISCR, unless otherwise instructed by a competent Liberian court.

3.23    That as to count nine (9) of the petition, Respondent confirms that LISCR does not file Articles of Incorporation or Amendments to Articles of Incorporation of Liberian corporations. The Registrar or Deputy Registrar will not file or amend a Liberian corporation's Articles of Incorporation unless it is done upon the decision made by the corporation and not pursuant to the order of a foreign court that has not been recognized by the courts of Liberia by way of petition for the enforcement of judgment.

3.24    That as to count ten (10) and eleven (11) of the petition, Respondent says that a foreign judgment i.e. a confirmation order confirming a Chapter 11 plan confirmation judgment of the Southern District of New York Bankruptcy Court which purports to cancel and extinguish the common shares of a non-resident Liberian corporation and purports to issue new shares ("Reorganized Equity") is not considered conclusive as to any act(s) enumerated therein, and cannot be given automatic effect under Liberian law, but may be admitted as evidence and enforced by a Liberian court based on comity. The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and <u>it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied].</u> In the instant case, Respondent says that it would be unjust and inequitable to give effect to the foreign judgment sought to be enforced by the Petitioner for all of the reasons stated above. Even if the Respondent appeared in the foreign court, neither the Constitution of Liberia (1986), the statute or any case law has established that a foreign judgment is conclusive against a party, if the party appeared and the foreign court purportedly or actually had jurisdiction. The subject of foreign judgment is captured under **Chapter 25.12 of the Civil Procedure Law**, which deals with evidence. The foreign judgment is taken as evidence, but it is not considered conclusive and enforceable. The decision of what effect if any is to be given to the judgment as a piece of evidence, lies within the sound discretion of the court considering comity between and amongst states, and other factors such as justice and equity.

3.25  That as to count twelve (12) of the petition, Respondent says that it is without sufficient information to confirm or deny the averment.

3.26.  That as to count thirteen (13) of the Petition, a fundamental requirement for the enforcement of a foreign judgment in Liberia is that the judgment sought to be enforced must in the discretion of the court be considered just and equitable. The Petitioners have failed to show that the judgment sought to be enforced is just and equitable. The Petitioners have instead sought to only establish that the US court which rendered the judgment had jurisdiction to do so, and that the Respondent appeared in the proceedings. The Petitioners have also failed to show that this court (the sixth judicial circuit) has jurisdiction to hear the enforcement of judgment from a Bankruptcy Court of a foreign state/jurisdiction.

3.27  That as to the prayer of the Petitioner, Respondent says that judgment concludes against only persons that are parties to the case out of which the judgment grows. In the instant case, the Petitioner has failed to name and designate LISCR as a party to the suit even if they are considered nominal. Notwithstanding, Petitioner requests court to take actions against LISCR which impacts the rights of the Respondent, without designating LISCR as a Party. Respondent therefore request that the Petitioner's request for this court's order directed at LISCR should be disregarded.

3.28  Respondent denies all and singular the allegations of laws facts that were specifically traversed and reserves the right to interpose appropriate objections and defenses including objection to jurisdiction during the hearing or in any subsequent proceedings.

WHEREFORE, and in view of the foregoing, Respondent prays Your Honour to:

(i) Issue an Interim Order prohibiting the Petitioner from continuing to hold itself as shareholders, director, and attempting to control the Respondent and its affiliates pending the conclusion of these proceedings.

(ii) Deny and dismiss the petition

(iii) Grant unto Respondent any and all such further relief deemed by Your Honour to be just, legal, and equitable as in keeping with law.

Respectfully Submitted:
The above-named Respondent,
Eletson Holdings Inc.
By and thru their Legal Counsels
Lex Group Liberia
Opposite Dominion Christian Fellowship Church
Congo Town, Monrovia, Liberia

J. Daku Mulbah
Counsellor-At-Law

Elizabeth Horace-Kwemi
Counsellor-At-Law

Dated this 16th day December A. D., 2024

10